```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                        SOUTHEASTERN DIVISION
```

ANDREW C. FREEMAN,                )
                                  )
            Plaintiff,             )
                                  )
      v.                           )      No. 1:05 CV 3 RWS
                                  )                      DDN
JO ANNE B. BARNHART,               )
Commissioner of                    )
Social Security,                   )
                                  )
            Defendant.             )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for the judicial review of the final decision of the Commissioner of Social Security denying the application of plaintiff Andrew C. Freeman for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. The action was referred to the undersigned United States Magistrate Judge for a recommended disposition under 28 U.S.C. § 636(b).

**I. Background**

**A. Application and Medical Records**

In an application for benefits dated April 3, 2001, plaintiff alleges he became disabled on July 7, 2000, due to a bulging disc compression in the neck with a bruised spinal cord, and permanent nerve damage. (Tr. 71-73, 77.)

In a questionnaire completed by plaintiff on March 23, 2003, plaintiff reported he was six feet tall and 138 pounds. His disabling symptoms include a bulging disc in his neck, his spinal cord is bruised in the neck, and he has permanent nerve damage. He reports these problems affect all his life activities, including his strength and mobility. He alleges these conditions cause him pain. They first started to bother him on July 7, 2000, and he has been unable to work since that time.(Tr. 76-77.)

Plaintiff worked as a painter and handyman in a hotel from 1983 until 1987. His job duties varied, but he worked "all day." He reported using tools, machines and equipment at this job, and used technical skills and knowledge. He reported walking for 8 to 12 hours per day, standing 8 to 12 hours per day, sitting for 30 minutes per day, and climbing for 8 to 12 hours. He handled large objects for 8 to 12 hours, reached for 8 to 12 hours, and wrote for three hours. The heaviest weight he lifted was 100 pounds or more, and he reported lifting 50 pounds or more frequently. He reported supervising others, and he was able to hire and fire employees. (Tr. 78.)

From 1989 until 1998, he worked as a "bulkheady," for 8 to 12 hours per day.[1] (Tr. 78, 90.) Plaintiff reported lifting more than 100 pounds, and that he lifted more than 50 pounds frequently. At this job, he operated heavy machinery, walked and stood for six hours, knelt for two hours, crouched for three hours, handled and grasped big objects for 12 hours, and he never crawled, climbed, or sat. He did not supervise others. (Tr. 90.)

Plaintiff reported seeing doctors for his physical conditions, but not for any emotional or mental problems that might affect his ability to work. He reported taking Talwin,[2] and Xanax.[3] (Tr. 79-82.)

Plaintiff was in the military for six years, and he received special job training while enlisted. He has obtained his GED. (Tr. 83.)

In an interview conducted by telephone by Jim Story on April 1, 2003, it was noted plaintiff had no trouble hearing, reading, breathing, understanding, concentrating, talking, or with coherency. Story reported it was hard to get him to answer questions, because plaintiff kept referring him to his attorney's office to get the required information. (Tr. 85.)

---

[1]Plaintiff held a job at an unreadable law office, although he has omitted the dates he worked there. The name of his employer when he was a "bulkhead" is also unreadable. (Tr. 78.) In his work history report, plaintiff does not list the job he held until 2000. (Tr. 90-96.)

[2]Talwin is medication used to treat moderate to severe pain and swelling. Webmd.com/drugs. (Last visited January 17, 2006.)

[3]Xanax is used to treat anxiety and panic disorders. Webmd.com/drugs. (Last visited January 17, 2006.)

Plaintiff described his pain as "excruciating, unbearable, and constant." His medications, which he does not list, cause mood changes, nausea, excruciating headaches, rubbery legs, faintness and confusion. (Tr. 97-98.)

Plaintiff lives at home with his wife and two-year old child. He reports he does not pay bills or use a check book, but he can count change. He does not do laundry, dishes, or iron because of his pain. He does make the bed, take out the trash, shop, bank, and go to the post office. He also states he does not vacuum, do home repairs, car maintenance, mow the lawn, rake the leaves, or garden. (Tr. 98-99.)

Plaintiff reports that his pain lasts all day. He can shop for 10 minutes, once or twice a week. He prepares no meals, and has trouble sleeping. His loss of mobility makes it difficult for him to shower and groom himself. He reports being unable to participate in any hobbies or activities. He is able to watch a 30 minute television show, but not an hour long program or a two hour movie. (Tr. 99-100.)

Plaintiff reports feeling "excruciating, unbearable pain" when reading books and newspapers. He does not play video games or use a computer. Although advised not to drive, he stated that he drives 15 miles or less to get necessities for his family about twice a week. He claims he is easily confused due to his medication, and that he easily forgets things. (Tr. 101.)

In May 2003, plaintiff reported having attempted to work since his request for reconsideration was filed. He attempted to do hand digging and backhoe work. He states his condition has deteriorated since April 2003. He takes Tylenol PM two or three times daily. (Tr. 103.)

On April 12, 1999, plaintiff saw John L. Hunt, M.D., with complaints of chest tightening, dizziness, and weak legs. (Tr. 144.) On May 8, 1999, plaintiff complained to Dr. Hunt of stomach pains and dizziness. Dr. Hunt stated plaintiff suffered from possible hypertension. (Tr. 143.)

On October 5, 1999, Douglas M. Baird, D.O., examined plaintiff. He diagnosed him with rhinitis[4] and bronchitis and prescribed Zithromax[5] and Syn-Rx DM.[6] Dr. Baird noted that plaintiff was stable and doing well, and instructed him to call if his condition worsened. (Tr. 142.)

On October 15, 1999, Dr. Baird again examined plaintiff. He noted he had a swelling on his index finger, but that plaintiff denied any trauma to the area. (Tr. 139.)

On December 29, 1999, plaintiff saw Dr. Baird, complaining of problems with his left upper leg. It was noted plaintiff was alert, cooperative, and well oriented. (Tr. 138.)

On November 29, 2000, plaintiff saw Tom Brummit, D.O. for pain. Dr. Brummit found that plaintiff has degenerative changes in his C5-6 disc, and facet degenerative changes at the C4-5 and C6-7 levels. (Tr. 112.)

Dr. Hunt also examined plaintiff on November 29, 2000. Plaintiff complained of pain in the right side of his neck. He stated the pain went from his neck into his right shoulder and down to his elbow. Plaintiff said this pain resulted from an injury three months earlier, when a sheriff held him down and twisted his neck. He was diagnosed with a herniated cervical disc. An MRI was ordered. After his results were received on December 1, 2000, he was referred to David G. Yingling, M.D. (Tr. 135-36.)

Plaintiff contacted Dr. Hunt on December 6, 2000, requesting more pain medication due to an increase in pain. (Tr. 135.) On December 29,

---

[4]Rhinitis, typically called hay fever, is an allergic reaction to particles in the air. Webmd.com/hw/allergies. (Last visited January 17, 2006.)

[5]Zithromax is used to treat bacterial infections, specifically of the respiratory tract, sexually transmitted diseases and skin infections. Webmd.com/drugs. (Last visited January 17, 2006.)

[6]Syn-Rx DM is an expectorant used to help clear mucus and chest congestion. Webmd.com/drugs. (Last visited January 17, 2006.)

-4-

2000, and again on January 17, 2001, plaintiff was prescribed Darvocet[7] and Vioxx.[8]

On January 18, 2001, Dr. Yingling reported to Dr. Hunt on his examination of plaintiff. Plaintiff told Dr. Yingling that he has had neck pain since an altercation with a police officer in late 2000. Plaintiff had subjective complaints of pain and numbness in his right arm. (Tr. 149.) Dr. Yingling noted that plaintiff appeared to be well-developed, well-nourished, and in no acute distress. His cranial nerves II through XII were intact, and he had a good range of motion in his neck, and mild tenderness in his right neck and shoulder muscles. An MRI showed that plaintiff had congenital stenosis[9] compounded by disk protrusion and that plaintiff had muscular pain in his right neck and shoulder. The degree of the stenosis was unclear, and Dr. Yingling was not sure whether there was any spinal cord compression. Dr. Yingling suggested physical therapy three times a week for two weeks, at which time another MRI would better assess the degree of the stenosis and determine if surgery was required. (Tr. 149-50.)

On February 6, 2001, Dr. Yingling noted that plaintiff felt he could not tolerate the physical therapy because it increased his pain. Dr. Yingling reported that plaintiff had a good range of motion in his neck. An MRI showed a disc protrusion at C4-5 and C5-6, which was worse at C5-6 and caused a flattening of the spinal cord. The C5-6 area also showed evidence of edema or contusion. The risks and benefits of surgery were discussed. Plaintiff indicated his personal life might delay surgery for a while. (Tr. 148.)

On February 15, 2001, plaintiff saw Dr. Hunt who noted that plaintiff was considering but had not yet decided on surgery. On February 21, 2001, plaintiff sent a letter to Dr. Hunt explaining that

---

[7]Darvocet is a combined narcotic and nonnarcotic used to treat mild to moderate pain. Webmd.com/drugs. (Last visited January 17, 2006.)

[8]Vioxx is a nonsteroidal anti-inflammatory drug used to treat pain and swelling. Webmd.com/drugs. (Last visited January 17, 2006.)

[9]Cervical spinal stenosis is a narrowing of the spinal canal that occurs when excessive growth of the spinal bone decreases the space of the opening of the spinal bones. It can cause pain, weakness in the legs, and numbness. Webmd.com/hw/back_pain. (Last visited January 17, 2006.)

personal issues, specifically the upcoming birth of a child, required that he not undergo surgery until August or September 2001. It was noted plaintiff was taking Talwin. (Tr. 132-33.)

On March 15, 2001, and April 24, 2001, plaintiff requested refills of Talwin and Xanax. On April 26, 2001, plaintiff requested a refill of Talwin because he dropped what he had and ran over it with the lawnmower. (Tr. 132.)

On May 17, 2001, plaintiff requested from Dr. Hunt a refill of Xanax. Dr. Hunt prescribed a smaller number of Xanax pills. Dr. Hunt noted that he was refilling the prescription but that it must last one month. (Tr. 131.)

On May 23, 2001, plaintiff was examined by Allan C. Gobio, M.D., a neurosurgeon. The neurological examination revealed that plaintiff was alert, but under severe distress due to neck, shoulder, and arm pain. His motor strength in his arms was intact, with no atrophy. His neck showed a decreased range of motion. Dr. Gobio diagnosed plaintiff with a cervical nerve root compression at the C5-6 level. He recommended continuing plaintiff on Talwin and possible cervical epidural steroid injections. (Tr. 152-53.)

On May 30, 2001, Dr. Hunt noted that plaintiff suffered from "much anxiety." He prescribed Xanax, and referred plaintiff to a family counseling center. (Tr. 130.)

On July 3, 2001, plaintiff again saw Dr. Hunt who noted plaintiff needed surgery on his neck. Dr. Hunt prescribed Vioxx, and refilled plaintiff's Talwin and Xanax prescription. (Tr. 129.)

On August 22, 2001, plaintiff saw Dr. Hunt for a cut on the middle finger of his right hand. The cut was three weeks old at that time, and was infected. (Tr. 128.) On August 28, 2001, plaintiff again saw Dr. Hunt about the cut; after one month it had not healed and was swollen and painful. (Tr. 127.)

On August 28, 2001, plaintiff was examined by Dennis Luetkemeyer, M.D., with complaints of an abscess on his finger. The doctor noted there was a possible foreign object in his finger after viewing the x-rays of his hand. (Tr. 110.)

On October 9, 2001, plaintiff returned to Dr. Hunt for the cut on his finger, and because he was experiencing sinus drainage. He had a mild cough. (Tr. 126.)

On November 21, 2001, plaintiff called Dr. Hunt requesting a refill of Talwin. (Tr. 118.)

On January 31, 2002, plaintiff saw Dr. Hunt for neck pain and fluid in his chest. Dr. Hunt noted his neck had mild tenderness. Dr. Hunt refilled plaintiff's Talwin prescription. The doctor noted he refilled Talwin and Xanax on March 18, 2002, and refilled Vioxx on April 4, 2002. (Tr. 125.)

On April 10, 2002, plaintiff called Dr. Hunt to get an early refill of his Talwin prescription. On March 17, it was noted Dr. Hunt allowed 30 Talwin per month. On May 17 and June 12, 2002, the Talwin prescription was refilled. (Tr. 124.)

On June 13, 2002, plaintiff went to Dr. Hunt complaining that he had re-injured his back and neck two and one half weeks before. The doctor noted there was a "small brown area" on the right side of plaintiff's ribs. Dr. Hunt diagnosed him with chronic degenerative joint disease of the C-spine, and it was noted his prescriptions had been refilled the day before. (Tr. 123.)

On August 2, 2002, plaintiff saw Dr. Hunt seeking to have his neck x-rayed because the pain in his neck was getting worse. An x-ray was performed, and Dr. Hunt diagnosed plaintiff with a cervical condition.[10] (Tr. 122.)

On August 2, 2002, plaintiff was examined by Kenneth Mann, D.O., who noted there was a narrowing intervertebral disc space at plaintiff's C5-6. Plaintiff's soft tissue was unremarkable, and there was no evidence of a fracture. He opined plaintiff suffered from degenerative changes to his cervical spine, which were most pronounced at C5-6. (Tr. 109.)

On August 21, 2002, plaintiff saw Dr. Hunt, complaining of stomach problems, pain in his right ankle, headaches, and left knee and leg

---

[10]The specific diagnosis is unreadable. (Tr. 122.)

-7-

numbness.  A rectal exam indicated colitis.  A colonoscopy was ordered. (Tr. 121.)

On September 10, 2002, plaintiff returned to Dr. Hunt for a follow up appointment after his normal colonoscopy.  It was noted his prescriptions for Talwin and Xanax were to be refilled on October 1, 2002, and October 28, 2002.  (Tr. 117.)

On September 11, 2002, plaintiff saw Tom Brumitt, D.O., for left side pain.  Dr. Brumitt noted plaintiff's liver was not enlarged, that his kidneys were similar in size and there was no mass or obstruction, and that his pancreas and spleen appeared normal.  (Tr. 108.)

On January 13, 2003, plaintiff was examined by Stephen Smith, M.D. Plaintiff had complaints of neck pain after he hurt his neck while using a backhoe three weeks before.  Dr. Smith diagnosed plaintiff with cervical disc disease.  He recommended an MRI of the cervical spine, and renewed his prescriptions for Talwin and Xanax.  He refilled the Talwin on January 17, 2003.  (Tr. 116.)

On January 15, 2003, plaintiff was examined by Tom Brumitt, D.O., who found that plaintiff had reverse curvature of the cervical spine, and it was noted plaintiff would be referred to a neurologist if his symptoms did not improve.  (Tr. 199.)

On March 10, 2003, plaintiff was examined by Dr. Hunt, who prescribed plaintiff Zyrtec[11] for his runny nose.  Plaintiff's primary complaint that day was a sore throat.  (Tr. 114.)

In a March 18, 2003 letter to Dr. Hunt, Dr. Yingling noted that plaintiff had been unable to have surgery due to personal reasons.  He noted plaintiff continued to have pain.  It was noted plaintiff had a good range of motion in his neck.  He also had good strength in his legs and arms.  Another MRI was performed, and it was noted plaintiff had a "fairly tight stenosis at C5-6" and some stenosis at the C4-5.  A repeat MRI was recommended to help determine what surgery would be appropriate. (Tr. 146-47.)

---

[11]Zyrtec is an antihistamine used to provide relief from seasonal allergies.  Webmd.com/drugs.  (Last visited January. 17, 2006.)

On March 28, 2003, plaintiff was examined by Dr. Hunt, who diagnosed plaintiff with a cervical problem.[12] It was noted plaintiff cancelled an MRI which was to be performed on April 1, 2003. Dr. Hunt refilled plaintiff's Talwin and Xanax prescriptions on April 7, 2003. (Tr. 113.) On May 2, 2003, Dr. Hunt opined that the heaviest weight plaintiff could lift both occasionally and frequently is 10 pounds. He found that plaintiff could stand or walk less than two hours in an eight-hour workday. In an eight-hour workday, plaintiff must periodically alternate between sitting and standing to relieve his discomfort. (Tr. 155.)

On May 6, 2003, a physical residual functional capacity assessment was performed by counselor Aaron Spiatt. Spiatt found that plaintiff could lift 20 pounds occasionally and 10 pounds frequently. In an eight-hour workday, plaintiff could stand or walk for six hours, sit for six hours, and had unlimited ability to push or pull. Plaintiff was found able to frequently climb stairs, ramps, ladders, ropes, and scaffolds, and to frequently stoop, kneel, crouch, and crawl. He was found never to be able to balance. He was unlimited in his ability to handle, finger, and feel, but was limited in his ability to reach in all directions, due to his degenerative disc disease. Plaintiff was to avoid vibration. (Tr. 158-64.)

On May 7, 2003, plaintiff had a psychiatric review performed by psychiatrist Peter S. Moran, D.O. Dr. Moran noted plaintiff has medical impairments that were not severe, and had anxiety-based disorders. Dr. Moran noted plaintiff had mild restrictions in his daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, and pace. Dr. Moran noted plaintiff's functioning was not limited by any mental impairment. He found that plaintiff had a non-severe impairment and found him only partially credible. (Tr. 166-78.)

On September 3, 2003, plaintiff went to Dr. Hunt complaining that his left arm was numb, that he was experiencing shoulder and neck pain, and that it hurt when he coughed or sneezed. Plaintiff told Dr. Hunt he

---

[12]The exact diagnosis is unreadable. (Tr. 113.)

-9-

had not taken pain medications since June.  Dr. Hunt prescribed Talacen[13] and Zanaflex.[14]  (Tr. 193.)

On September 30, 2003, plaintiff reported neck and shoulder pain to Dr. Hunt, and requested medication refills.  Dr. Hunt noted plaintiff was "doing great."  His neck pain was "stable" and his prescriptions were refilled.  (Tr. 192.)  On October 29, 2003, plaintiff saw Dr. Hunt, for his neck and shoulder pain.  His prescriptions were refilled.  (Tr. 191.)

On January 29, 2004, plaintiff saw Dr. Hunt for a follow-up appointment for his pain.  Plaintiff was diagnosed with back pain and stomach problems.  (Tr. 188.)

On February 27, 2004, plaintiff went to Dr. Hunt for a medication refill and a follow-up appointment for his pain.  He was diagnosed with back pain.  (Tr. 187.)  On March 25, 2004, Dr. Hunt diagnosed back pain and his medications were refilled.  (Tr. 186.)

On May 26, 2004, plaintiff was examined by Dr. Hunt, who noted plaintiff had back pain and loss of appetite.

**B.  Testimony of Plaintiff**

In a hearing held on July 13, 2004, plaintiff testified that he lived with his wife and three-year old daughter.  Approximately two months before the hearing, he tried to go back to work at the business owned by his wife.  That business is "directional boring" which entails drilling under roads for utilities such as gas, water, and electric.  He tried to work on a backhoe for half a day, but quit due to his hand going numb.  He testified he had not worked steadily since 2000 or 2001, but that he had attempted unsuccessfully three times to go back to work since then.  (Tr. 29-31.)

He testified he had a fractured disc which was touching his spinal cord.  This limited his mobility, and he was unable to lift and move things.  He thought he could lift around five pounds without pain.  His

---

[13] Talacen is used to treat mild to moderate pain, and to reduce fever. Webmd.com/drugs.  (Last visited January 17, 2006.)

[14] Zanaflex is used to treat muscle spasms caused by brain or spinal disease.  Webmd.com/drugs.  (Last visited January 17, 2006.)

-10-

daughter weighed 22 pounds, and it was "tough" to lift her. He testified he had constant numbness in his hands and arms. (Tr. 31-34.)

Plaintiff testified that the medication he takes causes headaches, blurred vision, and affects urination. He has no problem walking, but standing for long periods of time is difficult. He described the pain as a nine or ten on a ten point scale. When sitting, he must constantly shift position; he has problems driving due to the necessary movement. (Tr. 34-37.)

Plaintiff testified he has problems gripping things in his hands. This made operating a stick shift in a machine difficult. He can push with his left hand. He does not work around the house, such as gardening or lawn mowing. He lives near his in-laws so they can help him. He testified the Talacen makes him nauseous and he sometimes vomits 30 minutes after taking it. (Tr. 37-40.)

He testified he had not had an additional MRI done as Dr. Yingling requested, because he has no health insurance and is unable to pay for it himself. (Tr. 41.)

In a typical day, plaintiff reports he gets up early and he and his wife take calls from his wife's business crews who are on location. He also feeds his child. He does not have any hobbies. He used to enjoy playing the guitar but cannot do so anymore because of his pain. (Tr. 41-42.)

Plaintiff testified he could stand for seven minutes in an eight-hour workday. He could sit for less than one hour. He is able to grasp better with his left hand than his right. He testified he could lift at least 10 pounds with his left arm. (Tr. 44.)

The ALJ asked plaintiff, after hearing the VE's testimony that he was able to perform the sedentary job of telephone operator, whether he could perform such work since he testified he helped his wife call and set up business for the family owned business. He testified that he was not sure whether that was something he could not do, and that he would not know unless he tried such a job. (Tr. 51.)

## C. Testimony of Vocational Expert

At the July 13, 2004, hearing, VE Randi Langford Hetrick testified that plaintiff's past relevant work was classified as medium work. When faced with this hypothetical

> assume Claimant were 41 years old with a 12th grade education, could perform sedentary work with mild pain, would have a moderate limitation for fine manipulation abilities in the right hand. Would there be entry-level work the Claimant-and also-oh, could only stand or walk two hours out of an eight-hour day

(Tr. 47), she testified that such a person could perform a full range of sedentary, unskilled work. These jobs included sedentary assembly jobs, and that in Missouri, there were approximately 3,000 jobs. Nationally, there were approximately 160,000 jobs. These jobs also included sedentary clerical jobs, and there were 62,000 of these jobs nationally. She also testified he could perform jobs of production and inspection, and that there were approximately 900 such jobs in Missouri, and 80,000 nationally. (Tr. 48-49.)

When asked about a person who suffered the symptoms that plaintiff described, i.e., that he was unable to sit or stand for more than one hour per day, and that he could lift 10 pounds with his left arm and five pounds with his right arm, the VE testified that a person with those limitations could not work.

## D. Decision of the ALJ

In a July 29, 2004 decision denying benefits, the ALJ found that plaintiff had not engaged in substantial gainful employment since the onset of his alleged disability. He found that plaintiff's spinal cervical stenosis was a severe impairment, but did not meet or equal one of the impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 17.)

The ALJ noted that plaintiff was treated by Dr. Yingling and Dr. Hunt. He considered the residual functional capacity assessment performed by both Dr. Hunt and the state's consultant. (Tr. 15.)

The ALJ found that plaintiff's subjective complaints were not credible. According to the plaintiff's own testimony, he had performed clerical work for his wife's business. The ALJ noted plaintiff moved his

-12-

right arm freely during the hearing. He noted that plaintiff testified that a telephone solicitor job might be something he could do. (Tr. 14-17.)

The ALJ found that plaintiff had the RFC to work at sedentary exertion levels, to stand or walk for two hours in an eight-hour workday, with moderate limitations of fine manipulation in his right hand. The ALJ found that plaintiff was unable to perform his past relevant work, but that he had the RFC to perform a wide range of sedentary work. (Tr. 17.)

### II. Discussion

**A. General Legal Framework**

The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.; Jones v. Barnhart, 335 F.3d 697, 698 (8th Cir. 2003). In determining whether the evidence is substantial, the court must consider evidence that detracts from, as well as supports, the Commissioner's decision. See Brosnahan v. Barnhart, 336 F.3d 671, 675 (8th Cir. 2003). As long as substantial evidence supports the final decision, the court may not reverse merely because opposing substantial evidence exists in the record or because the court would have decided the case differently. See Krogmeier, 294 F.3d at 1022.

To be entitled to benefits on account of disability, claimant must prove that he is unable to perform any substantial gainful activity due to any medically determinable physical or mental impairment, which would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), 423(d)(1)(A), 1382c(a)(3)(A) (2004). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. § 404.1520 (2003); see also Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (describing the framework); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003).

If the Commissioner can find that a claimant is or is not disabled at any step, a determination or decision is made and the next step is not reached. 20 C.F.R. § 404.1520(a)(4).

**B. Subjective Complaints**

Plaintiff argues that the ALJ did not properly credit his subjective complaints of pain when determining his RFC. Specifically, plaintiff argues that the ALJ did not properly consider the pain associated with his impairments and erroneously discredited his complaints. (Doc. 7.)

The RFC is "the most [a claimant] can still do despite" his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). When determining plaintiff's RFC, the ALJ must consider all relevant evidence but ultimately the determination of the plaintiff's RFC is a medical question. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). As such, the determination of plaintiff's ability to function in the workplace must be based on some medical evidence. Id.; see also Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Assessing a claimant's credibility is primarily the ALJ's function. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003). In Singh v. Apfel, the Eighth Circuit held that an ALJ who rejects subjective complaints of pain must make an express credibility determination explaining the reasons for discrediting the complaints. Singh, 222 F.3d 448, 452 (8th Cir. 2000).

"The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians . . . ." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Factors to be considered include the claimant's daily activities, the duration, frequency, and intensity of the pain, any precipitating factors, whether the claimant has been taking pain medication and the dose, and functional restrictions. Id.; Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003). The ALJ may not discredit subjective complaints based solely on personal observation. Polaski, 739 F.2d at 1322. "Subjective complaints may be discounted if

there are inconsistencies in the record as a whole." Singh, 222 F.3d at 452.

Here, the ALJ discredited plaintiff's subjective complaints of pain, because during the hearing plaintiff at first appeared to have no use of his right arm but then moved it freely. The ALJ stated that plaintiff also testified he was ambidextrous, he had no problem walking, and he helps his wife with their business. Plaintiff also testified that a telephone solicitor job might be something he could do. (Tr. 15.) Defendant argues that the plaintiff's complaints were inconsistent with the complaints he made to doctors. (Doc. 8 at 9.)

Upon the record of this case, the ALJ gave too much weight to plaintiff's demeanor at the hearing, because he moved his right arm freely. Free movement of his arm is not the same as using it to lift objects or to grip, or to have the ability, with moderate limitation, to finely manipulate the right hand. (Tr. 17.) While the ALJ can consider plaintiff's demeanor during the hearing, the way in which plaintiff moved his arm freely is not substantial evidence discrediting his complaints of pain. See Reinhart v. Secretary, Health & Human Services, 733 F.2d 571, 573 (8th Cir. 1984) (cannot reject plaintiff's complaints of pain solely on personal observations).

Further, the ALJ gave substantial weight to plaintiff's testimony that he makes telephone calls for his wife's business. However, plaintiff testified that "we," which included him and his wife, spoke by phone with a crew in Texarkana to see what they needed. He testified he watched their child while his wife ran the company. His ability to answer the phone in his own home is not the same as performing a telephone solicitor job. Further, plaintiff reported being unable to perform many household chores, requiring help from his wife and in-laws. Plaintiff's ability to perform some household chores is not substantial evidence supporting discrediting his complaints of pain. See Easter v. Bowen, 867 F.2d 1128, 1130 (8th Cir. 1989).

The ALJ did not mention in his decision plaintiff's long-term use of prescription pain medication. Plaintiff had been taking Talwin, which is prescribed for moderate to severe pain, at least as early at February 2001. Before that, plaintiff took Darvocet and Vioxx. Since the ALJ never mentioned plaintiff's use of pain medication, it is unclear whether

he considered it, or why such use was found not credible.  See Miller v. Sullivan, 953 F.2d 417, 423 (8th Cir. 1992 ("personal physician believed [plaintiff's] discomfort strong enough to prescribe a potent pain-killing medication.").

The ALJ did not articulate why he did not find credible plaintiff's complaints of "excruciating" pain which he described as a nine or 10. Nor does the ALJ point to any inconsistency with plaintiff's described level of pain and the medical records.  Defendant argues that plaintiff's complaints of pain were inconsistent with what he told his doctors. However, the medical records do not support this argument.  No doctor reported that plaintiff was malingering.  Further, doctors recommended that plaintiff should undergo surgery for his condition, and consistently prescribed pain medication.

The extent of pain experienced by plaintiff is important in the determination of plaintiff's disability.  When the VE was asked whether a person with the pain described by plaintiff could work, she testified that such a person could not work. Therefore, a more thorough inquiry and consideration into plaintiff's subjective pain is necessary to fully develop the record.  The ALJ should be required to fully and expressly state the reasons for and the extent to which he discredited plaintiff's subjective complaints of pain.

### RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed under Sentence 4 of 42 U.S.C. § 405(g) and the action remanded to the Commissioner for further proceedings consistent with this opinion.

The parties are advised that they have ten (10) days in which to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.


                                               /s/ David D. Noce
                                               **DAVID D. NOCE**
                                               **UNITED STATES MAGISTRATE JUDGE**


Signed on January 26, 2006.